FILED

2007 Dec-17  PM 03:50
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

MELODY RUTH BELL,

        Plaintiff,             CV 07-J-0864-NE

v.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

## MEMORANDUM OPINION

This matter is before the court on the record and briefs of the parties.  This court has jurisdiction pursuant to 42 U.S.C. § 405.  The plaintiff is seeking reversal of a final adverse decision of the Commissioner of Social Security denying her claim that she was entitled to disability insurance benefits and supplemental security income.

The court has considered the record and briefs of the parties.  For the reasons set forth herein, the decision of the Commissioner is due to be **REVERSED**.

1

**Factual Background**

The plaintiff, Ms. Bell, is a forty-nine year old woman who was employed as a floral designer until she was no longer able to work because of neck pain (R-64).  The first medical evidence of record is a February 1, 2000, operative report from the Alabama Pain Center (R-289).  The report states that on February 1, 2000, Ms. Bell underwent a cervical epidurogram in which injections were made to Ms. Bell's C1-2, C2-3, C3-4, C4-5, C5-6, C6-7, C7-T1, T1-2, T2-3, T3-4, and T4-5 facet joints.  *Id*.

In May of 2000, Ms. Bell underwent the first of two cervical fusions (R-120).  The first fusion dealt with a herniation at the C6-7 level  (R-121).  Following the surgery, Ms. Bell continued to have discomfort in her neck and left arm  (*see e.g.*, R-124, 126, 128, 154).  Because of the increasing discomfort from which Ms. Bell was suffering, the decision was made to have a second cervical fusion (R-151).  The record indicates that the second surgery fused the C5 joint to the C7 joint (R-150).  Ms. Bell's surgeon reported that the second surgery was successful, but that she was still suffering from substantial discomfort in her neck following the surgery (R-149).

In order to treat the persistent discomfort in her neck and left arm, Ms. Bell saw Dr. Bret Fremming multiple times between January 3, 2001, and February 19,

2

2003 (R-359-421).  Apparently, Ms. Bell's surgeon recommended a third surgery, but Ms. Bell was reluctant to undergo another surgery (R-421).  Dr. Fremming treated Ms. Bell's symptoms primarily through prescription medications (*see e.g.*, 416-420).  In a January 3, 2001, examination by Dr. Fremming, Ms. Bell stated that her pain was a maximum of 8/10 and a minimum of 4/10 (R-419).  On February 19, 2003, Ms. Bell was terminated by Dr. Fremming because she was not complying with the pain management contract (R-359).

Following her discharge from Dr. Fremming's care, Ms. Bell was treated at the Madison County Mental Health Center for depression and anxiety (R-366, 451-468).  Ms. Bell first visited the Mental Health Center on August 14, 2003 (R-462).  The "Diagnostic Assessment" states that Ms. Bell was seeking treatment for depression and anxiety resulting from her recent discovery that her boyfriend's son had sexually abused her daughter (R-462-63).  The Mental Health Center diagnosed Ms. Bell with moderate to recurrent major depressive disorder ("MDD") and gave her a Global Assessment of Functioning  ("GAF") score of 43. (R-467).  An April 4, 2004, report states that Ms. Bell was still suffering from moderate to recurrent MDD and gave her a GAF score of 50 (R-455).  On November 11, 2004, Ms. Bell was discharged from the Mental Health Center's care for non-compliance (R-451).  Apparently, Ms. Bell's non-compliance was not

contacting the Mental Health Center for ninety days (R-451, 554).

At her hearing on March 3, 2006, Ms. Bell testified that she was taking Methadone, Ambien, and Benicar to treat her neck pain, but that she was not taking any prescription medications for her depression (R-111, 552-53).  When asked about her level of pain, Ms. Bell responded that it was a 9/10 even with her medications (R-565).  Ms. Bell also testified that she suffered three to four muscle spasms in her neck per day (R-563-64).  These spasms lasted from thirty minutes to four hours in duration (R-564).  Ms. Bell testified that the pain from the muscle spasms was an 8/10.  *Id*.

When asked about her daily activities, Ms. Bell responded that she was capable of taking care of her personal needs such as bathing, dressing, and fixing her hair (R-555).  Ms. Bell also testified that she could do some "light" grocery shopping, but that she could not pick up heavy items or push a heavy shopping cart.  *Id*.  Around the house, Ms. Bell stated that she could do some "light" dusting, light loads of laundry, and wash dishes, but she could not vacuum or do yard work (R-556).  At night, Ms. Bell stated that she only slept about four hours per night because of trouble getting comfortable (R-554-55).

When asked about her depression, Ms. Bell responded that her depression caused her to feel fatigued and overwhelmed at times (R-572).  Ms. Bell stated

that she would become fatigued very quickly while doing daily activities such as washing dishes and that she tended to be very forgetful (R-572-73).  Ms. Bell testified that she suffered three to four panic attacks a week (R-573).

Ms. Bell's last full-time employment was as a floral designer (R-559-60). Ms. Bell quit her job as a floral designer because it required too much heavy lifting (R-560).  In 2001 Ms. Bell worked as a server at Bennigans Restaurant (R-559).  Ms. Bell quit after only three months because of her illness.  *Id*.  Although it was not discussed at her hearing, during 2001 and 2002 Ms. Bell also worked for her husband developing condominiums in Florida (R-372, 374, 384, 386, 390, 392, 394).  In 2003 Ms. Bell worked as a banquet servicer for Raddison Inn (R-559).  Ms. Bell quit that job because it required too much heavy lifting (R-560). At the time of her hearing, Ms. Bell was working part-time (three to four times per week for four hours) babysitting and doing light dusting (R-558).  Special accommodations were made at this job so that Ms. Bell did not have to dust objects that would aggravate her condition (R-561).  Ms. Bell was also allowed to take a fifteen minute break every thirty minutes.  *Id*.

At the hearing, the Administrative Law Judge ("ALJ") heard testimony from a vocational expert ("VE") (R-574).  The VE testified that Ms. Bell could not return to her previous job as a floral designer because of her limitations (R-574-

5

75).  However, the VE testified that if Ms. Bell was capable of frequently lifting

and carrying up to twenty pounds with her right arm and assisting with her left arm

then she could work in a light, unskilled job such as a ticket taker, information

clerk, or order clerk (R-575).  However, the VE testified that if Ms. Bell's

statements of pain were fully credible (at a level of 8/10), then she would be

suffering from pain above a moderate level, which would preclude all work

activities (R-576).  The VE also testified that if Ms. Bell had a GAF score below

50, then she would not be capable of performing any jobs (R-576).

    In his decision, the ALJ found that the plaintiff had the severe impairments

of cervical degenerative disc disease, status post anterior diskectomy and fusion

times two, obesity, and major depressive disorder, but no impairment or

combination of impairments that meets or equals one of the listed impairments in

20 CFR Part 404, Subpart P, Appendix 1 (R-12, 16).  The ALJ concluded that Ms.

Bell

> could frequently lift and carry 10 pounds and occasionally lift and
> carry 20 pounds with her right arm (using her left arm to guide and
> assist), and she could never perform repetitive bending, stooping, or
> pushing or pulling with her left hand and arm, and she would have
> moderate or less pain.

(R-16).  In reaching this conclusion, the ALJ found that Ms. Bell's "medically

determinable impairments could reasonably be expected to produce the alleged

symptoms, but that the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible." (R-17).

In his decision, the ALJ gave great weight to the opinions of Dr. Lary regarding the plaintiff's physical limitations and Dr. Confer regarding the plaintiff's mental limitations (R-17). Both of these doctors only saw the plaintiff once. *Id*. However, the ALJ chose to give their opinions great weight because they were consistent with the medical evidence of record. *Id*.

Dr. Lary examined Ms. Bell on July 19, 2004, and found that Ms. Bell's

ability to sit, stand, walk, bend, squat, reach, see, hear, speak, understand, manipulate small objects with dominant right hand, and lift and carry with dominant right arm is unimpaired. Her ability to lift, carry, and manipulate objects with non-dominant left hand and left arm is impaired by cervical disk disease.

(R-134). Dr. Confer examined Ms. Bell on May 22, 2006 and found that Ms. Bell suffered from recurrent, moderate to marked MDD; Dr. Confer also found that Ms. Bell suffered from chronic pain and gave her a GAF score of 55 (R-529). Dr. Confer's prognosis states that Ms. Bell "does have chronic depression that does appear to be under-treated at this time. Her symptoms may improve with psychoactive medication." *Id*.

### Standard of Review

This court's review of the factual findings in disability cases is limited to

determining whether the record contains substantial evidence to support the ALJ's findings and whether the  correct legal standards were applied.  42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Wolfe v. Chater*, 86 F.3d 1072, 1076 (11th Cir.1996); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir.1990).  "Substantial evidence" is generally defined as "such relevant evidence as a reasonable mind would accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Miles v. Chater*, 84 F.3d 1397 (11th Cir.1996); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir.1983).

In determining whether substantial evidence exists, this court must scrutinize the record in its entirety, taking into account evidence both favorable and unfavorable to the Commissioner's decision.  *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir.1988); *Walker v. Bowen*, 826 F.2d 996, 1000 (11th Cir.1987).  "Even if the Court finds that the evidence weighs against the Commissioner's decision, the Court must affirm if the decision is supported by substantial evidence."  *Allen v. Schweiker*, 642 F.2d 799,800 (5th Cir.1981); *see also Harwell v. Heckler*, 735 F.2d 1292 (11th Cir.1984); *Martin v. Sullivan*, 894 F.2d 1520 (11th Cir.1990).

This court must also be satisfied that the decision of the Commissioner is grounded in the proper application of the appropriate legal standards. *McRoberts*

*v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988); *Bridges v. Bowen,* 815 F.2d 622,

624 (11th Cir.1987); *Davis v. Shalala*, 985 F.2d 528 (11th Cir. 1993).   This court

may not decide facts anew, reweigh evidence or substitute its judgment for that of

the ALJ, even if the court finds that the weight of the evidence is against the

Commissioner's decision.  *Martin*, 894 F.2d at 1529.  This court must affirm the

decision of the ALJ if it is supported by substantial evidence.  *Miles*, 84 F.3d at

1397; *Bloodsworth*, 703 F.2d at 1239.   However, no such presumption of

correctness applies to the Commissioner's conclusions of law, including the

determination of the proper standard to be applied in reviewing claims.  *Brown v.*

*Sullivan*, 921 F. 2d 1233, 1235 (11thCir. 1991); *Cornelius v. Sullivan*, 936 F.2d

1143, 1145 (11th Cir. 1991).   Furthermore, the Commissioner's "failure to apply

the correct law or to provide the reviewing court with sufficient reasoning for

determining that the proper legal analysis has been conducted mandates reversal."

*Cornelius*, 936 F.2d at 1145-1146.

## Legal Analysis

In the case before the court, the ALJ determined that Ms. Bell had a residual

functional capacity to perform work at the light, unskilled level.  The court finds

the record devoid of substantial evidence to support this decision.

Ms. Bell argues that the ALJ gave improper weight to Dr. Confer's opinion

and failed to give proper weight to the opinions of her treating psychologist.  The testimony of a treating physician must ordinarily be given substantial or considerable weight unless good cause is shown to the contrary.  *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986).  Good cause exists where the evidence supports a contrary finding.  *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997).  The treating physician's report may be discounted when it is not accompanied by objective medical evidence or is wholly conclusory.  *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991).  The ALJ must specify what weight is given to a treating physician's opinion and any reason for giving it no weight.  *MacGregor*, 786 F.2d at 1053.  If the ALJ fails to specify the weight given, the physician's opinion is accepted as true as a matter of law.  *Id*.

In his decision, the ALJ states that he assigns great weight to the opinion of Dr. Confer.  The ALJ failed to assign any weight to the opinions of Ms. Bell's treating psychologist at the Madison County Mental Health Center.  Ms. Bell's treating psychologist at the Mental Health Center assigned Ms. Bell a GAF of 43 on August 14, 2003, and a GAF of 50 on April 4, 2004.  The ALJ provides no explanation for why he did not give substantial or considerable weight to the two lower GAF scores that Ms. Bell's treating psychologist assigned to her.  The ALJ also does not discuss the fact that Ms. Bell's treating psychologist and Dr. Confer

agreed that Ms. Bell suffered from moderate to recurrent MDD. When Dr.

Confer's opinion is considered in conjunction with the opinions of Ms. Bell's

treating psychologist, the evidence demonstrates that since August 14, 2003, Ms.

Bell has been suffering from severe depression which has seriously impaired her

ability to work.

Ms. Bell also argues that the ALJ's finding concerning her lack or

credibility is not supported by substantial evidence.  Credibility determinations

about subjective testimony are generally reserved to the ALJ.  *See Johns v. Bowen*,

821 F.2d 551, 557 (11th Cir.1987).  But if the ALJ "decides not to credit such

testimony, he must articulate explicit and adequate reasons for doing so."  *Holt v.*

*Sullivan*, 921 F.2d 1221, 1223 (11th Cir.1991).  In addition, the Eleventh Circuit

Court of Appeals has "established a three part 'pain standard' that applies when a

claimant attempts to establish disability through his or her own testimony of pain

or other subjective symptoms."  *Id*.  This standard requires the following things:

> (1) evidence of an underlying medical condition and either (2)
> objective medical evidence that confirms the severity of the alleged
> pain arising from the condition or (3) that the objectively determined
> medical condition is of such a severity that it can be reasonably
> expected to give rise to the alleged pain.

*Id*.  "[A] claimant's subjective testimony supported by medical evidence that

satisfies the standard is itself sufficient to support a finding of disability."  *Id*.

The reasons offered by the ALJ in support of his finding that Ms. Bell's statements are not fully credible are unreasonable and inadequate.  As support for his opinion, the ALJ states that Ms. Bell's described daily activities are not limited to the extent one would expect of a person suffering from disabling pain (R-17).  The ALJ is referring to Ms. Bell's statements that she can take care of her personal needs, do light grocery shopping, light housework, light laundry, wash dishes, and watch television.  *Id*.  Except for watching television, each of these activities is a necessary activity of limited duration that is not inconsistent with Ms. Bell's stated limitations.  *See Lewis v. Callahan*, 125 F.3d 1436, 1441 (11th Cir. 1997).  While the ALJ acknowledges all of the activities that Ms. Bell is still able to perform, he fails to acknowledge the activities that Ms. Bell is incapable of performing because of her impairments.  For example, the ALJ failed to acknowledge that Ms. Bell only sleeps about four hours per night, that she cannot vacuum, and that she cannot do yard work because of her limitations (R-554-56).

The next reason provided by the ALJ is that Ms. Bell's two surgeries were "generally successful" in relieving Ms. Bell's symptoms (R-17).  However, the ALJ does not point to any medical evidence of record which indicates that the surgeries were "generally successful" in relieving Ms. Bell's symptoms.  In fact, stating that the surgeries were "generally successful" in relieving Ms. Bell's

12

symptoms mis-characterizes the medical evidence of record.  For example, one of

Dr. Seymour's reports following the first fusion shows that while Dr. Seymour

was satisfied with the result, Ms. Bell was still suffering significant discomfort in

her neck and left arm (R-123, 124, 126, 127, 128).  The reports following the

second surgery are very similar.  For example, a February 5, 2001, letter from Dr.

Zeiger to Dr. Gray states that "[Ms. Bell's] flexion-extension films, today, look

excellent.  There has been a solid fusion.  There is excellent restoration of space

and neuroforaminal volume at C5-6 and C6-7. [Ms. Bell] says she is definitely

better, but she still has a lot of neck discomfort."  (R-149).  These reports show

that the two surgeries were successful in the sense that the surgery went well, but

that the surgeries were not "generally successful" in relieving Ms. Bell of her

symptoms.  The medical evidence is clear that following both surgeries, Ms. Bell

was still suffering from substantial pain in her neck and left arm.  In fact, Ms. Bell

was suffering so much discomfort following the second surgery that her surgeon

recommended a third surgery (R-421).

The remaining reasons offered by the ALJ are similarly inadequate for

finding Ms. Bell's statements not fully credible.  The ALJ states that evidence in

the record that Ms. Bell was not completely compliant in taking her prescription

medications suggests that Ms. Bell's symptoms are not as limiting as she claims

(R-17).  The only evidence in the record to support the ALJ's conclusion is a note in one of Dr. Fremming's reports that states that Ms. Bell has possibly been noncompliant with her medicines (R-398).  The report does not explain the nature of Ms. Bell's noncompliance and Ms. Bell was not asked about her noncompliance at her hearing.  Regardless of the nature of Ms. Bell's noncompliance, it is unclear from the ALJ's conclusory statement how one note about Ms. Bell's possible noncompliance in a record that is in excess of five hundred and fifty pages is evidence that Ms. Bell's statements are not fully credible.

The next reason offered by the ALJ is that Ms. Bell made inconsistent statements about whether she suffers side effects from her medications (R-17).   At the hearing, the ALJ asked Ms. Bell if she suffered side effects from the medications which she was taking (R-554).  It is unclear from the transcript whether the ALJ is referring to the medications which Ms. Bell was taking for her neck pain or whether he was also referring to the medication that she had been prescribed for her depression.  The second question was asked by Ms. Bell's attorney and it clearly concerned the medication that Ms. Bell was no longer taking for her depression (R-572).  Given the confusion over the subject matter of the first question, this reason is also inadequate support for finding Ms. Bell's statements less than credible.

Finally, Ms. Bell's work activity during her alleged period of disability is not evidence that Ms. Bell's symptoms are not as severe as she claims. The ALJ neglects the fact that Ms. Bell was forced to quit two jobs after only a couple of months because she could not meet the physical demands. In her current job, special accommodations are made for Ms. Bell's limitations so that she does not have to dust anywhere that will aggravate her symptoms. She is also given fifteen minute breaks every thirty minutes. The ALJ apparently thought it was significant that Ms. Bell described one of her job requirements as babysitting. The ALJ stated that "[Ms. Bell] is apparently able to care for young children, which can be quite demanding both physically and emotionally, without any particular assistance." (R-17). While the ALJ assigns importance to Ms. Bell's babysitting duties in his opinion, he did not ask Ms. Bell any questions about her responsibilities at the hearing or whether she actually has any assistance. Therefore, the ALJ's statement about her babysitting duties is nothing more than an assumption based on his own experiences and is not based on any evidence in the record.

For the foregoing reasons, the ALJ's finding that Ms. Bell's statement concerning her symptoms is not fully credible is not supported by substantial evidence. If Ms. Bell's statements regarding her pain were accepted as fully credible, the VE testified that she would be unable to work at any type of job.

Since there is objective medical evidence in the record to support Ms. Bell's assertions that she suffers from disabling pain, the ALJ should have found her to be disabled.

Finally, Ms. Bell argues that the ALJ failed to consider the combined effects of her MDD and chronic neck pain.  When making a disability determination, the ALJ must consider the combined effects of all impairments.  *Davis v. Shalala*, 985 F.2d at 533; *Swindle v. Sullivan*, 914 F.2d 222, 226 (11th Cir.1990); *Walker v. Bowen*, 826 F.2d 996, 1001 (11th Cir.1987).  When more than one impairment exists, the plaintiff may be found disabled even though none of the impairments considered alone would be disabling.  *Id*.  The ALJ must evaluate the combination of impairments with respect to the effect they have on the plaintiff's ability to perform the duties of work for which he or she is otherwise capable.  *Lucas v. Sullivan*, 918 F.2d 1567, 1574 (11th Cir.1990).  Merely reciting that the plaintiff's impairments in combination are not disabling is not enough.  The ALJ is required to make specific and well articulated findings as to the effect of the combination of impairments.  *Walker*, 826 F.2d at 1001.

In this case, the ALJ did not make specific and well articulated findings as to the effect of the combination of impairments.  The ALJ merely recited that Ms. Bell's impairments in combination are not disabling.  Here, Ms. Bell underwent

16

two extremely painful fusion surgeries and also suffers from major depressive disorder.  The ALJ's failure to consider Ms. Bell's physical impairments and pain complaints in combination with her depression alone requires that the decision be reversed and remanded for reconsideration.  *Walker*, 826 F.2d at 1001.  However, when this reason is combined with the ALJ's failure to properly consider the opinions of Ms. Bell's treating psychologist and the ALJ's improper credibility determination, the court finds that the ALJ's decision is due to be REVERSED.

### Conclusion

When the evidence has been fully developed and unequivocally points to a specific finding, the reviewing court may enter the finding that the Commissioner should have made.  *Reyes v. Heckler*, 601 F. Supp. 34, 37 (S.D. Fla. 1984).  Thus, this court has the authority under 42 U.S.C. § 405(g) to reverse the Commissioner's decision without remand, where, as here, the Commissioner's determination is in plain disregard of the overwhelming weight of the evidence. *Davis v. Shalala*, 985 F.2d at 534.

Based on the lack of substantial evidence in support of the ALJ's findings, it is hereby

**ORDERED** that the decision of the Commissioner is **REVERSED**.  This case is **REMANDED** to the Agency to calculate the plaintiff's monetary benefits in

accordance with this Opinion.

**DONE** and **ORDERED** the 17th day of December 2007.

INGE PRYTZ JOHNSON
U.S. DISTRICT JUDGE